THROCKMORTON
AND RUSSELL.
*vs*
LEWELLIN, *et al.*

---

# Throckmorton and Russell *vs* Jinny Lewellin, *et al.*

CHANCERY.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

*Slaves. Emancipation. Specific performance.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

THIS is a suit instituted in chancery by Jinny Lewellin, a free woman of color, and her daughter, Mary Adams, and her three children, against Throckmorton and Russell, to enforce specifically the emancipation of Mary Adams and her three children, under the alledged contract to do so, upon their refunding to Throckmorton, out of their services, the price of their purchase by him, from one Crow, of Virginia, and interest thereon, the said Russell having purchased one of them from Throckmorton, with the like understanding, alledging that they had refunded the price and interest.

*Case* 120.

*July* 4.

The case stated.

THROCKMORTON
AND RUSSELL.
  vs
LEWELLIN, et al.

Can a parol con-
tract for the e-
mancipation of a
slave be specifi-
cally enforced?
Qu. But conce-
ding that it may,
the person with
whom the con-
tract is made,
and not the
slave, is the per-
son who must
ask its specific
performance.

If it be conceded that a parol contract for the emanci-
pation of slaves may be specifically enforced in a Court
of Chancery, we insist that the contract should be fair
and reasonable, certain in its terms, made with a person
able to contract, and for a fair and adequate consideration.
Testing the case before us by these rules, we would re-
mark, that we have carefully examined the record over
and over again, together with the long and ingenious briefs
of the counsel on both sides, and must say that waiving
the entire want of correspondence between the allega-
tions and proofs, we can perceive no such contract made
by the appellants, upon which we can base a decree for
the emancipation of the slaves in question. No such con-
tract was made with Crow, and if it had been, he alone
could ask its enforcement. There is an entire failure of
proof to establish the fact that the slaves were purchased
with or under the subscription paper signed by Bates,
Russell and others. Nor was that paper ever delivered
to Crow, or taken by him as the evidence of the consid-
eration, or terms of the sale, nor does it appear that it
was ever seen by him. 'It was most likely abandoned as
a vain and foolish project, proposing terms which Crow
or any sensible man, would never accede to. But if it
was shown to Crow, Throckmorton never signed it, or
agreed to be subject to its terms, nor does it appear that
he ever saw it, or heard of it until after the slaves arrived
in Louisville. On the other hand, it clearly appears that
'Throckmorton purchased them for his own use, through
his brother, as agent, under the authority of a letter borne
by Jinny Lewellin, and shown to Crow, as is proven by
Crow and Everett, (in substance corresponding with the
copy exhibited.) They were sold by Crow to him as
slaves for life, and an absolute bill of sale executed. If
terms and limitations upon his purchase could be set up
by parol evidence, without proof of mistake or fraud, no
such terms or stipulations are shown as agreed to by him
or his agent. The slaves and their mother, were, no
doubt, anxious for Throckmorton to buy them, as well to
get clear of the hands of a slave dealer, as to get to Louis-
ville, where the mother resided, and may have held out
inducements to Crow, of an expectation of ultimate free-

dom. And they may, in fact, have conceived the idea, that if they could get to Louisville, that they might, through the instrumentality of Bates and Russell, and other friends, be able to obtain their freedom. But no promise or agreement is shown to have been made by Throckmorton or his agent, on the subject. The same hopes and expectations may have induced Joe, the husband of Mary Adams, to surrender up his claim for the $100 previously advanced. Though Crow proves that the $100 was paid by the *negroes* as a part of the purchase, it is clear that he is mistaken in this statement. The $100 was paid months before, for a different purpose, and on a distinct contract, which Throckmorton or his agent never saw, nor so far as appears, heard of till after this suit was brought. And if Joe did give up his claim to the $100, as an inducement to the sale to Throckmorton, there is no evidence that he or his agent was apprized of it, and if they were, there is no evidence that it abated any thing from the price they were *willing* or *agreed* to give for the purchase. And it is proven by Everett, that to his knowledge, Throckmorton paid, in a draft, $600 or $700, and it is not pretended that the price of the slaves exceeded $600. It is also proven by Crow, that payment was made in a draft on New York. Besides, Throckmorton was willing to take from Bates and Russell, that amount with incidental expenses.

Did Throckmorton before or after his absolute purchase from Crow, make any specific agreement with Jinny Lewellin, for the emancipation of the slaves? If so, when or where was it made, and upon what consideration? Did she pay him, or come under any obligation to pay him any thing? Did he make any specific agreement with Bates, or any other free man capable of contracting? If so, when or where was it made? It is true, after the slaves arrived in Louisville, Throckmorton discovering that they would not suit his business, or having heard of the proposition of Bates and others upon the subscription to buy them, with a view to their emancipation, was willing, and proposed to Bates to take them at his purchase, including expenses; and he may have agreed, as an inducement, that they were purchased un-

THROCKMORTON
AND RUSSELL
*vs*
LEWELLIN, *et al.*

der the subscription; but Bates refused to do so, and surely this proposition cannot be construed to amount to a binding contract to emancipate, or to authorize the Chancellor to substitute him against his will, in the place of Bates, and require him to surrender his absolute purchase, upon terms so unreasonable and uncertain, as that of risking the lives of the slaves, and looking to a woman and children, his own slaves, for the payment of the price of their purchase. If such an agreement can be enforced against Throckmorton, it would be an easy matter for an agreement equally specific to be made out and enforced against any absolute owner of a slave.

There is nothing in the character of the accounts exhibited, of items of money deposited with Throckmorton, that is incompatible with a hiring, or inconsistent with the explanation given by him in his answer. The sums paid, sometimes fall short, and sometimes may have exceeded the amount of hire. But it is reasonable to suppose, that as she collected money, that she would deposite the same with her master, in advance of her hire, as the safest place of deposit. Besides, it is proven by Everett, that these sums were paid as *hire*, or that she did *hire* her own *time* from her master, and pay *him* for the same. Moreover, it is proven by Pratt, that Mary Adams acknowledged to him that she was the slave of Throckmorton, and *hired* her own *time* from him. Upon the whole, without pursuing the subject further, or going into a more critical analysis of the facts, we are perfectly satisfied, that no such contract is made out as will authorize this Court to decree specifically the emancipation of the slaves, either against Throckmorton or Russell. The latter derived his title by purchase from the former, and holds under him, and has done nothing since, which lays him under any legal obligation to emancipate the slave he purchased. He said, as is proven by Bates, a single witness against his answer, that he *intended* to free the slave when her services paid him the amount he advanced; but this declaration cannot be construed into a *contract*. It is made with no one able to contract, nor was it made upon *consideration*. It was the mere dec-

laration of an intention, which imposed no *legal* obliga- <span style="float:right">EVANS.<br>*vs*<br>ROBINSON, &c.</span>

tion upon him.

The decree of the Chancellor is therefore reversed, and cause remanded, that the bill may be dismissed.

*Fry & Page, Letcher & Tilford, Duncan and Critten-den* for appellants: *Browne and Crawford* for appellees.